ITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATALIE JIREK, NANCY LEDINSKY,          )
and JUDY TESKE, individually and on behalf )
of all others similarly situated,          )
                                           )
            Plaintiffs,                    )
                                           )        No. 21 C 6929
        v.                                 )
                                           )        Judge Sara L. Ellis
ASTRAZENECA PHARMACEUTICALS LP,  )
                                           )
            Defendant.                     )

## OPINION AND ORDER

Plaintiffs Natalie Jirek, Nancy Ledinsky, and Judy Teske bring this collective action on

behalf of themselves and similarly situated individuals against Defendant AstraZeneca

Pharmaceuticals L.P. ("AstraZeneca"), alleging that AstraZeneca paid female sales employees

less than their male counterparts for the same work in violation of the Equal Pay Act ("EPA"),

29 U.S.C. § 206(d), and the Illinois Equal Pay Act ("IEPA"), 820 Ill. Comp. Stat. 112/1 *et seq.*

For the purposes of their EPA claim, Plaintiffs seek to conditionally certify a collective defined

as "all females employed by AstraZeneca in sales positions" since December 30, 2018. Doc. 88

at 6. Plaintiffs also ask the Court to approve their draft Notice and Consent forms and a notice

plan to inform potential collective members of their putative rights, and request equitable tolling

of the statute of limitations as of the date of their motion. AstraZeneca opposes Plaintiffs'

motion.

The Court grants in part and denies in part Plaintiffs' motion. The Court conditionally

certifies Plaintiffs' proposed collective, approves Plaintiffs' notice plan, and grants partial

equitable tolling of the statute of limitations. The parties, however, must work together to finalize their joint Notice and Consent forms.

## BACKGROUND

### I.  AstraZeneca Sales Representatives

AstraZeneca is a pharmaceutical company that creates medications in therapeutic areas including Oncology, Respiratory, Cardiovascular, Biologic, Immunological, Renal, and Metabolic. To sell its broad range of pharmaceuticals, AstraZeneca employs over 3,500 sales representatives. When it needs to hire additional sales representatives, AstraZeneca posts a job listing on its website specific to the type of representative needed and geographic area for the position. These job postings have included: a Primary Care position in Reno, Nevada, Doc. 88-1 at 12; a Cardiovascular Specialty position in Cleveland, Ohio, *id.* at 26; a Pharmaceutical Sales Specialist position in Elgin Heights, Illinois, *id.* at 95; Cardiovascular, Renal, and Metabolic Disease Primary Care positions in Tyler, Texas, and Inglewood, California, *id.* at 110, 142; an Oncology Account Specialist (Lung) position in Richmond, Virginia, *id.* at 121; Immunology Sales Specialist positions in Portland, Oregon, and Beverly Hills, California, *id.* at 131, 164; a Renal Specialty Sales Specialist position in Grand Rapids, Michigan, *id.* at 153; and a Respiratory & Immunology Primary Care position in Anchorage, Alaska, *id.* at 174. The job postings have identical "What you'll do," *see, e.g.*, *id.* at 13, "Why AstraZeneca?", *see, e.g.*, *id.* at 14, and "Success Profile" sections, *see, e.g.*, *id.* at 14–15. The job listings also include a "Responsibilities" section that contains largely similar language with some modest differences across specialties. For example, the Primary Care listing for Reno says the sales representative "will develop superior product and disease state knowledge and effectively educate and engage healthcare professionals in dialogue about clinical evidence, approved indications, and product

efficacy/safety profiles to support on-label prescribing for appropriate patients." *Id.* at 16. This language is repeated or slightly modified for other job postings. *See, e.g.*, *id.* at 112 (CVRM Primary Care in Tyler) (same language); *id.* at 123 (Oncology Account Specialist (Lung) in Richmond) ("Educate and engage [healthcare professionals] in dialogue about efficacy, safety, and dosing profiles for FDA-approved indications to support on-label prescribing for appropriate patients[.]"); *id.* at 133 (Immunology Sales Specialist in Portland) ("You will develop superior product and disease state knowledge and effectively educate and engage healthcare professionals in dialogue about clinical evidence, approved indications, and product efficacy/safety profiles to support on-label prescribing for appropriate patients."). The Reno sales representative will also "develop[] and maintain in-depth knowledge of . . . information relative to [their] assigned sales territory" and "develop a local strategy and business plan to generate" sales, *id.* at 16, mirroring the duties of other sales representatives, *see, e.g.*, *id.* at 112–13 (CVRM Primary Care in Tyler) (similar language); *id.* at 123 (Oncology Account Specialist (Lung) in Richmond) ("Develop engagement plans focused on key account partners; share plans with cross-functional peers and manager to align collective and coordinate AZ approach, and ensure appropriate engagement"); *id.* at 133 (Immunology Sales Specialist in Portland) (sales representative will "[d]evelop and maintain in-depth knowledge of . . . information relative to your assigned sales territory" and "work . . . to develop local strategy and business plan to generate recognizable increases of sales").

AstraZeneca's job listings note some differences among essential and desired qualifications for each role. *Compare, e.g.*, *id.* at 17 (requiring only a bachelor's degree, valid driver's license, and safe driving record, and desiring, *inter alia*, "[k]nowledge of the medical, healthcare or pharmacy industry and skills in clinical"), *with id.* at 31 (requiring, *inter alia*, a

3

bachelor's degree, two years of "documented, full-time, successful pharmaceutical sales OR 3 years sales experience in scientific/clinical/healthcare environment OR demonstrated experience & knowledge within healthcare ecosystems," "[s]trong clinical skill, and sales ability," and desiring, *inter alia*, "[f]our or more years in AZ Pharmaceutical Sales (Internal Only), or related sales experience, preferably in the anti-platelet, cardiovascular, gastrointestinal, and respiratory markets").

Although there appear to be strong similarities among the job descriptions across sales representative roles, Monica Marsh, AstraZeneca's Vice President Human Resources, who submitted a declaration (the "Marsh Declaration"), states that the "day-to-day duties of Sales Representatives vary widely depending on several factors, such as their assigned medications and therapy areas, selling environment, and reimbursement processes applicable to their assigned medications and providers." Doc. 95-1 ¶ 6.

Once hired, AstraZeneca evaluates its salesforce members according to the "Career Ladder Program Guide" (the "Career Ladder"), of which Plaintiffs submitted a July 2010 copy. Doc. 88-1 at 72–87. According to the Marsh Declaration, the Career Ladder "has not been in effect at AstraZeneca since sometime in 2015," Doc. 95-1 ¶ 16, although Plaintiffs claim to have understood the Career Ladder as being in effect throughout their respective tenures at AstraZeneca. The Career Ladder sets out several "[Pharmaceutical Sales Specialist ("PSS")] Success Factors" that "are the criteria that will be used consistently across the country to develop and promote our PSS sales force from one Career Ladder Level to the next." Doc. 88-1 at 74. The Career Ladder consists of five rungs ("Levels," in AstraZeneca's parlance) and the manual describes how salesforce members can climb the ladder ("ensure promotion," in AstraZeneca's words). A salesperson can ensure promotion to the next Level through "[c]onsistent

performance, over time, of all PSS Success Factors," which are "Brings Value to Customers," "Expertise," "Strategic Selling," "Demonstrates Initiative and Learning," and "Accountable for Results." *Id.* at 74–75. The Career Ladder describes the necessary achievements within each "success factor" for a salesperson to reach the next Level. For example, to "Bring[] Value to Customers," a Level 1 Salesperson must "[b]uild relationships and address[] customers' expressed needs," while a Level 2 Salesperson must "[a]ddress customers' underlying needs." *Id.* at 84. A Level 5 Salesperson must have "long-term, strategic relationships with customers." *Id.* Likewise, in order for a salesperson to demonstrate "Strategic Selling," they must be "proficient in selling skills, territory planning and efficiency," "take[] a broad, long-term perspective to strategic selling," or "maintain[] same level of proficiency as PSS 4 and ha[ve] national, strategic selling recognition" depending on whether they are achieving Levels 1, 3, or 5 of the Career Ladder. *Id.* at 86.

## II. The OFCCP Agreement

In September 2021, the United States Department of Labor's Office of Federal Contract Compliance Programs reached an agreement with AstraZeneca regarding AstraZeneca's compliance with certain federal regulations from October 1, 2015, through September 20, 2016 (the "OFCCP Agreement"). *See id.* at 42–70. The OFCCP Agreement alleged that AstraZeneca violated Executive Order 11246 and 41 C.F.R. §§ 60-1.4(a)(1) and 60-20.4 by undercompensating female employees in certain roles in comparison to their male coworkers. Specifically, the OFCCP Agreement alleged that in the Wilmington, Delaware region, AstraZeneca undercompensated 295 women holding Specialty Care Sales Representative Level 4 positions as compared to 228 men in similar positions by an average of $2,182.07. It also alleged that AstraZeneca undercompensated 23 Hispanic female employees who held Primary

Care Sales Representative Level 3 positions as compared to 211 men in similar positions by an average of $5,381.99.

Under the terms of the OFCCP Agreement, AstraZeneca created a $560,000 settlement fund to compensate the employees who suffered discrimination. AstraZeneca provided notice to the affected employees of the agreement so they could benefit from the settlement fund, and agreed to "conduct a regression analysis of compensation . . . for all employees" in the affected sales positions to determine if there was ongoing pay discrimination. *Id.* at 48.[1] Additionally, AstraZeneca agreed to "immediately eliminate compensation practices that negatively affect[ed] the compensation of female" salespersons in the affected job categories. *Id.*

### III. Plaintiffs' Backgrounds

Natalie Jirek earned her bachelor's degree in business in 1999 from Western Illinois University. She worked at AstraZeneca as a sales representative in community and large hospital settings from 2000 until 2020, earning a Master of Business Administration from Benedictine University during her employment in 2004. Jirek's job duties included interfacing with medical professionals, networking with other pharmaceutical representatives, and maintaining current knowledge regarding her assigned products, the pharmaceutical market, and AstraZeneca's competitors. Jirek states that her job duties remained static throughout her two decades of employment. In May 2017, when Jirek was working part-time on a four-days-per-week schedule, AstraZeneca promoted her from a Level 4 Executive Respiratory Specialty Care Representative to an Oncology Sales Representative, apparently also at the Level 4 rank. Eight months after receiving this promotion, however, AstraZeneca demoted Jirek to a Level 3 sales representative, which she claims was without cause. After Jirek complained to Human

---

[1] There is no evidence in the record regarding the outcome of these analyses.

Resources, AstraZeneca restored her to the Level 4 rank but did not re-adjust her pay. Jirek left AstraZeneca in 2020.

Judy Teske earned her bachelor's degree in Nursing, *cum laude*, from Northern Illinois University. She worked at AstraZeneca as a sales representative from 2000 until 2021, with the years 2015–2018 spent working as a Level 4 Health Systems Specialist sales representative in the Chicagoland area. In April 2018, AstraZeneca promoted Teske, apparently to a Level 4 Oncology Sales Representative position. She still served the Chicagoland area in this role, which she held from 2018–2021. Teske states that her job duties remained constant throughout her over two decades of employment. Her job duties included interfacing with medical professionals, networking with other pharmaceutical representatives, and maintaining current knowledge regarding her assigned products, the pharmaceutical market, and AstraZeneca's competitors. Teske left AstraZeneca in 2021.

Nancy Ledinsky earned her bachelor's degree in English and Speech Communication from Illinois State University. She worked at AstraZeneca as a sales representative from 2000 until 2021, with the years 2015–2018 spent as a Cardiovascular Hospital sales representative. Ledinsky received a promotion in 2016 to the Level 4 rank. Ledinsky states that her job duties were the same throughout her over two decades of employment. Her job duties included interfacing with medical professionals, networking with other pharmaceutical representatives, and maintaining current knowledge regarding her assigned products, the pharmaceutical market, and AstraZeneca's competitors. In 2017, Ledinsky's manager, Derrik Winston, informed her that AstraZeneca was paying her "significantly less than male sales representatives in the same or similar position as [her]." *Id.* at 9. Then, in December 2018, after AstraZeneca promoted Ledinsky to an Oncology Sales Representative role, her manager informed her that her pay

would be that of a Level 3 representative. Ledinsky states that this surprised her because a requirement for her new role was experience at the Level 4 rank, and because she knew a male sales representative had recently received a promotion to the Oncology Sales Representative role but was not demoted to Level 3. After Ledinsky informed her hiring manager, Steve Ward, about this discrepancy, Ward informed her that AstraZeneca was reinstating her Level 4 status but would continue to compensate her at the Level 3 rate. Ledinsky left AstraZeneca in 2021.

Each Plaintiff swears that, to the best of their individual knowledge, all sales representatives hold the same core job duties regardless of specialty, title, position, or territory. They each also state that throughout the course of their employment AstraZeneca applied the Career Ladder to them. They also each assert that they received notice of the OFCCP Agreement in November 2021. Each Plaintiff swears that, to their knowledge, AstraZeneca did not change its compensation policies in the wake of the OFCCP Agreement and that they were "not paid the same as male sales representatives because of [their] gender." *Id.* at 3, 6, 9.

## LEGAL STANDARD

The EPA forbids employers from paying employees of one sex less than employees of the other sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d). Under Section 216(b) of the Fair Labor Standards Act, an employee may bring his or her claim "through a 'collective action' on behalf of themselves and other 'similarly situated' employees." *Alvarez v. City of Chi.*, 605 F.3d 445, 448 (7th Cir. 2010) (citing 29 U.S.C. § 216(b)). "If the plaintiffs are able to show that other potential plaintiffs are similarly situated, courts may conditionally certify the case as a collective action and allow the plaintiffs to send notice of the case to similarly situated employees who may then opt in as plaintiffs." *Williams v. Ests. of*

*Hyde Park, LLC*, No. 19 C 2288, 2020 WL 1812386, at *2 (N.D. Ill. Apr. 9, 2020) (citation omitted).

District courts have "wide discretion" to manage collective actions. *Alvarez*, 605 F.3d at 449 (citing *Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 171 (1989)). Courts in this District have adopted a two-step process to determine whether an FLSA lawsuit should proceed as a collective action. *See In re New Albertsons, Inc.*, No. 21-2577, 2021 WL 4028428, at *1–2 (7th Cir. Sept. 1, 2021) (declining to review the district court's order granting conditional certification where the district court used the two-step process "regularly used in the Northern District of Illinois"); *Williams*, 2020 WL 1812386, at *1 ("[C]ollective FLSA actions in this district generally proceed under a two-step process."). The first step—the only step relevant here—is conditional certification, which requires a plaintiff to make a "modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1045 (N.D. Ill. 2003) (citation omitted) (internal quotation marks omitted). "The second stage in a collective proceeding comes after any opt-ins have appeared and discovery has been finished. Then the defendant is given an opportunity to move for decertification. At that stage, if requested to do so, the court makes a more rigorous examination of the facts relating to whether or not the case may appropriately continue as a collective action." *Bergman v. Kindred Healthcare, Inc.*, 949 F. Supp. 2d 852, 856 (N.D. Ill. 2013). "[The first step] is not intended to definitively resolve the question of whether this case is appropriate for collective treatment, but rather to assess whether it is appropriate to provide court-approved notice, to others who may be similarly situated, of the opportunity to join the case." *Hunter v. WirelessPCS Chi. LLC*, No. 18 CV 980, 2022 WL 864533, at *4 (N.D. Ill. Mar. 23, 2022) (citing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S.

66, 75 (2013) ("The sole consequence of conditional certification is the sending of court-approved written notice to employees[.]")). "Although lenient, the conditional certification standard is not a mere formality." *Vazquez v. Ferrara Candy Co.*, No. 14 C 4233, 2016 WL 4417071, at *5 (N.D. Ill. Aug. 19, 2016) (citation omitted) (internal quotation marks omitted). The "modest factual showing" requires factual support outside of the complaint, such as in the form of an affidavit, declaration, or other support beyond a plaintiff's allegations. *Id.* The plaintiff must establish "an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the [EPA]." *Nicks v. Koch Meat Co.*, 265 F. Supp. 3d 841, 849 (N.D. Ill. 2017). If a plaintiff makes the required showing, the Court may allow notice of the case to be provided to putative collective action plaintiffs. *Flores*, 289 F. Supp. 2d at 1045. Importantly, the "merits of a case are not decided at the first step, and the Court does not 'weigh evidence, determine credibility, or specifically consider opposing evidence presented by a Defendant.'" *Hunter*, 2022 WL 864533, at *3 (quoting *Bergman*, 949 F. Supp. 2d at 855–56).[2]

## ANALYSIS

The parties' briefing presents three issues. First, whether the Court should allow Plaintiffs to provide notice of this litigation to a conditionally certified collective, and how the Court should define the collective. Second, the form of the Notice and Consent forms and the method of reaching members of the conditionally certified collective. Third, whether the Court should equitably toll the relevant statute of limitations. The Court addresses these issues in turn.

---

[2] AstraZeneca argues that two out-of-circuit cases, *Swales v. KLLM Transport Services, L.L.C.*, 985 F.3d 430 (5th Cir. 2021), and *Clark v. A&L Homecare & Training Center, LLC*, 68 F.4th 1003 (6th Cir. 2023), provide "a particularly compelling opportunity" to evaluate Plaintiffs' motion under a new standard. Doc. 95 at 15. Without a Seventh Circuit case overruling the historic two-step approach that courts in this District routinely take to conditionally certify collective actions, the Court declines AstraZeneca's invitation to depart from this test.

I.      **Conditional Collective Certification**

Plaintiffs ask the Court to conditionally certify a collective defined as "all females employed by AstraZeneca in sales positions" since December 30, 2018.  Doc. 88 at 6. AstraZeneca argues that Plaintiffs failed to shoulder their modest evidentiary burden for their sweeping collective definition, and in the alternative propose that the Court limit certification to "Sales Representatives in the Chicago Area, where Ledinsky worked, [and] who held the same roles and levels that she did: Level 4 Cardiovascular Hospital Sales Representative and Level 4 Oncology Sales Representative."  Doc. 95 at 24.

Plaintiffs' evidence in support of their collective definition comprises ten online job postings, three declarations, two unequal pay violations as described in the OFCCP Agreement, and one Career Ladder Program Guide.  This is sufficient to justify Plaintiffs' requested conditional collective definition.  To start, the ten near-identical job listings that AstraZeneca posted on its website for areas as geographically diverse and dispersed as Anchorage, Alaska, and Richmond, Virginia, serve as circumstantial evidence that AstraZeneca's sales representatives nationwide perform similar duties, meaning that they would be similarly situated to Plaintiffs here.  Although the Court acknowledges that boilerplate job descriptions do not necessarily indicate identical job duties, it finds instructive the similar language that AstraZeneca uses to describe the responsibilities its sales representatives will perform.  For example, a Reno Primary Care sales representative "will develop superior product and disease state knowledge and effectively educate and engage healthcare professionals in dialogue about clinical evidence, approved indications, and product efficacy/safety profiles to support on-label prescribing for appropriate patients,"  Doc. 88-1 at 16, while an Oncology Account Specialist (Lung) in Richmond will "[e]ducate and engage [healthcare professionals] in dialogue about efficacy,

11

safety, and dosing profiles for FDA-approved indications to support on-label prescribing for appropriate patients," *id.* at 123. Although these listings employ different phrasing, these duties both boil down to "educate healthcare professionals about the medicine." A second example is how, based on the description of responsibilities, a Primary Care representative in Reno or Tyler has similar market analysis and sales duties as an Immunology Sales Specialist in Portland. *See id.* at 16 (Reno) (candidate will "develop[] and maintain in-depth knowledge of . . . information relative to [their] assigned sales territory" and "develop a local strategy and business plan to generate" sales); *id.* at 112–13 (Tyler) (similar language); *id.* at 133 (Portland) (similar language). These job descriptions, which AstraZeneca wrote of its own accord, provide evidence that supports Plaintiffs' contention that all sales representatives perform similar functions.

The Marsh Declaration attempts to diffuse some of this similarity, noting that the "day-to-day duties of Sales Representatives vary widely depending on several factors" and proceeding to explain how different therapeutic areas might lead the representatives to visit more or fewer healthcare professionals, possess different levels of knowledge about a medical area, or have longer sales cycles to sell a treatment. Marsh states that these differences, among others such as local market conditions, explain why compensation varies across sales representatives. AstraZeneca relies on the differences the Marsh Declaration identifies to argue that that the job listings to which Plaintiffs point to support the nationwide scope of their collective definition include language showing that sales representatives in different specialties have "highly variable duties, skills, experience, and responsibility across specialties and therapies." Doc. 95 at 23. But the job listings reveal that the duties are not as "highly variable" as AstraZeneca may desire—at least, not as described in the evidence put before the Court—and while Marsh's declaration shows that the extent to which sales representatives' duties vary across specialties is a matter of

factual dispute, it is premature for the Court to weigh such competing evidence. *See Bergman*, 949 F. Supp. 2d at 855–56 (the Court does not "weigh evidence, determine credibility, or specifically consider opposing evidence presented by a Defendant"). As to AstraZeneca's argument that "skills [and] experience" differ between individual sales representatives and specialty areas, the past experience a sales representative requires to sell a drug says nothing about the duties that representative performs when offering treatments to a healthcare professional. At the risk of repeating itself, it is too early for the Court to determine whether an Oncology sales representative has the same duties as a Cardiovascular Hospital or Primary Care sales representative. *See id.*

The Career Ladder adds weight to Plaintiffs' contention that all sales representatives perform similar functions and that AstraZeneca exercises central control over its salesforce such that a nationwide collective is appropriate. Although Marsh states that this Career Ladder "has not been in effect at AstraZeneca since sometime in 2015," Doc. 95-1 ¶ 16, Plaintiffs each swear that they understood the program to apply to them throughout their tenures at the company, Doc. 88-1 at 3, 6, 9. The Court thus cannot ignore this evidence without making a credibility determination, which would be inappropriate at this stage. *See Hunter*, 2022 WL 864533, at *3; *see also Soto v. Wings 'R US Romeoville, Inc.*, No. 15 C 10127, 2016 WL 4701444, at *8 (N.D. Ill. Sept. 8, 2016) ("[A]lthough Defendants have presented a modest factual showing of their own attempting to establish that they *did not* violate the law, that is insufficient to displace the testimony of the six declarants who say otherwise."). The fact that this Career Ladder purportedly applied nationwide and contained uniform benchmarks to evaluate all sales representatives shows that AstraZeneca set policies governing its sales representatives at a nationwide level, warranting a commensurately expansive collective definition. *See Nicks*, 265

F. Supp. 3d at 852–53 (granting conditional certification across all of a defendant's locations when the plaintiff provided evidence of common policy concerning some locations).

To further dispute the nationwide scope of Plaintiffs' collective definition, AstraZeneca points to *Vazquez*, where the court denied a motion for conditional certification when the Plaintiffs did not present evidence that their employer uniformly and unlawfully applied an otherwise legal policy across the entire collective. 2016 WL 4417071, at *6. AstraZeneca argues that this warrants the denial of Plaintiffs' conditional certification motion. But the OFCCP Agreement gives Plaintiffs the hook they need to tie the nationwide body of sales representatives to alleged widespread gender-based pay discrimination. Although it focused on allegations of disparate compensation between October 1, 2015 and September 30, 2016, the OFCCP Agreement included a requirement that AstraZeneca "eliminate discriminatory compensation practices" that may have been ongoing. Doc. 88-1 at 48. This provides circumstantial evidence that AstraZeneca was systemically undercompensating female sales representatives as compared to their male counterparts for two reasons. *See Nicks*, 265 F. Supp. 3d at 849 (plaintiff must show "an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the [EPA]"). First, the OFCCP Agreement shows the discrimination impacted a significant number of employees: summing the two job categories, AstraZeneca paid 318 female sales representatives in the Wilmington, Delaware region less than it paid male sales representatives doing the same work. Second, the fact that this discrimination occurred between male and female sales representatives in both the Specialty Care Sales Representative Level 4 and the Primary Care Sales Representative Level 3 positions indicates that the scope of the potential discrimination extends beyond a single Level or therapeutic specialty area. *See id.* at 44. Although AstraZeneca points out that the OFCCP Agreement

"expressly was a non-admission settlement without any adjudicated violation," Doc. 95 at 19, that does not mean it lacks value as evidence of systemic gender-based pay discrimination, *see* Fed. R. Evid. 401 (evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence"). Thus, although the OFCCP Agreement does not conclusively prove that AstraZeneca committed gender-based pay discrimination (as it is not an admission), it still lends support to the idea that such pay disparities were widespread. And the fact that a condition of the report was that AstraZeneca would "immediately eliminate compensation practices that negatively affect[ed] the compensation of female" salespersons in the affected job categories provides weight to Plaintiffs' contention that such discrimination continued beyond September 30, 2016, the end date of the discrimination with which the OFCCP Agreement was concerned. Doc. 88-1 at 48.

AstraZeneca's last argument against a nationwide collective definition focuses on what it claims is the lack of "unusual circumstances" in this case. *Toomey v. Car-X Assocs. Corp.*, No. 12 C 4017, 2013 WL 5448047, at *6–7 (N.D. Ill. Sept. 30, 2013) (quoting 29 C.F.R. § 1620.9(b)). Section 1620.9(b), which provides a definition for an "establishment," describes "unusual circumstances" to include when "a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions." *See Smith v. Allstate Ins. Corp.*, 24 F.Supp.2d 870, 879 (N.D. Ill. 1998) (unusual circumstances exist when compensation, job assignments, and promotions all occurred on regional basis). Here, Plaintiffs have provided evidence satisfying at least some of these "unusual circumstances," especially with respect to their job duties being performed under similar circumstances and similar tasks.

Finally, Plaintiffs' declarations tie their own employment at AstraZeneca to what has thus far been generic, disconnected evidence of pay discrimination. Each plaintiff belonged to a different specialty group before becoming Oncology Sales Representatives: Jirek worked as a Level 4 Executive Respiratory Specialty Care Representative before becoming an Oncology Sales Representative; Teske was a Level 4 Health Systems Specialist sales representative before becoming an Oncology Sales Representative; and Ledinsky spent several years as a Cardiovascular Hospital sales representative before becoming an Oncology Sales Representative. Jirek and Ledinsky each experienced concrete adverse employment actions, which they allege were based on their sex, namely receiving demotions to Level 3 Oncology Sales Representatives. Ledinsky met a male Pennsylvania-based sales representative who also received a promotion to Level 4 Oncology Sales Representative from a different specialty, but who did not subsequently receive a demotion to Level 3. Ledinsky also had a conversation with her regional manager in which he said that she was being paid less than male sales representatives because of her gender. Finally, all plaintiffs swear that they received notice of the OFCCP Agreement, that they are not aware of any changes to AstraZeneca's pay policies that the company made in the wake of the OFCCP Agreement, and that they each received less pay than male sales representatives due to their female gender.

Frankly, Plaintiffs' declarations do not say much, primarily regurgitating allegations contained in their already thin amended complaint. But another word for "allegations lifted from a complaint and repeated verbatim in a declaration" is "evidence," and arguably weak evidence is still evidence that the Court—again—may not weigh at this stage. *See Bergman*, 949 F. Supp. 2d at 855–56. Thus, although AstraZeneca's comment that Plaintiffs' declarations "contain

identical boilerplate mirroring the Complaint" is well-taken, Doc. 95 at 19, the Court will defer any sufficiency considerations until the second step.

Plaintiffs' declarations provide evidence that they suffered from gender-based pay discrimination. Ledinsky's declaration provides the most weight because she at least recounts a specific instance where a manager informed her that AstraZeneca was discriminating against her and an encounter with a male sales representative who was not demoted in rank after receiving a promotion to Oncology Sales Representative. Jirek's declaration also provides support through her experience with being demoted upon attaining the Oncology Sales Representative rank. And the three Plaintiffs in concert aver that AstraZeneca did not change its compensation practices in the wake of the OFCCP Agreement. Although specific instances of adverse gender-based discrimination—such as a conversation with a manager or demotion in rank—are absent from Teske's declaration, the three declarations read together provide at least some evidence that Plaintiffs suffered from some form of gender-based pay discrimination.

Read together, the job postings, Career Ladder, OFCCP Agreement, and Plaintiffs' declarations support Plaintiffs' nationwide collective scope by presenting evidence that AstraZeneca sets hiring policies at the national level, oversees its salesforce at the national level, has committed gender-based pay discrimination in different sales specialties and at different levels of the Career Ladder, and inflicted such discrimination upon Plaintiffs. *See Nicks*, 265 F. Supp. 3d at 852–53 (granting conditional certification across all defendant's locations when plaintiff provided evidence of common policy concerning some locations); *Pieksma v. Bridgeview Bank Mortg. Co.*, No. 15 C 7312, 2016 WL 7409909, at *6 (N.D. Ill. Dec. 22, 2016) (same); *Grosscup v. KPW Mgmt., Inc.*, 261 F. Supp. 3d 867, 877 (N.D. Ill. 2017) (granting collective certification across all Illinois and Maryland Buffalo Wild Wings locations based on

five declarations and documentary evidence from defendant); *Smith v. C.H. James Rest. Holdings, LLC*, No. 11 C 5545, 2012 WL 1144617, at *4 (N.D. Ill. Apr. 5, 2012) (granting conditional certification when plaintiff submitted limited evidence, including affidavit, in support of motion); *cf. Hunter*, 2022 WL 864533, at *4 (granting limited conditional certification when evidence only supported collective definition encompassing plaintiff's employment location). Weighing the evidence against the modest burden Plaintiffs must lift at this stage, *see Bergman*, 949 F. Supp. 2d at 855–56, the Court finds that they have shouldered it. For this reason, although the Court is cognizant of AstraZeneca's objections to Plaintiffs' efforts to sweep all sales representatives into a single category, the disputable value of the OFCCP Agreement, the arguably misplaced reliance on a possibly-outdated Career Ladder, and the relatively thin substance of Plaintiffs' declarations, it finds those arguments better suited for the second step of the certification process when the parties will have developed a more fulsome evidentiary record and the Court is better equipped to assess the final certification question. *See Bergman*, 949 F. Supp. 2d at 856 ("The second stage in a collective proceeding comes after any opt-ins have appeared and discovery has been finished. Then the defendant is given an opportunity to move for decertification. At that stage, if requested to do so, the court makes a more rigorous examination of the facts relating to whether or not the case may appropriately continue as a collective action.").

## II.  Proposed Notice

Second, Plaintiffs ask the Court to approve their notice plan. This includes approving Plaintiffs' "Notice" and "Consent" forms to send to conditional collective members, *see* Doc. 88-1 at 89–93; an order requiring AstraZeneca to produce the names, last known addresses, and last

known email addresses of all females employed by AstraZeneca in sales positions; and approval of the means by which Plaintiffs intend to notify the conditional collective.

### A.    Notice and Consent Forms

Plaintiffs first ask the Court to approve the forms they wish to send to potential collective members.  Although some minor disagreements appear to exist between the parties, they both have reported that they are nearing agreement on a final draft of these documents.  *See* Doc. 95 at 25 n.7; Doc. 102 at 15.  Indeed, Plaintiffs' reply brief indicates that AstraZeneca has provided line edits to the proposed forms and that Plaintiffs are "reviewing with the intent to finalize." Doc. 102 at 15.  The Court will not grant Plaintiffs' motion to approve their Notice and Consent forms and undo the negotiations that have occurred over the last four months.  Accordingly, the Court will deny this aspect of Plaintiffs' motion, and order the parties to submit joint Notice and Consent forms by May 28, 2024.  If the parties remain at an impasse after the meet and confer process, then the parties must each submit a proposed notice by May 28, 2024, and the Court will select the notice that it will allow Plaintiffs to send.

### B.    Production Order and Notice Plan

This brings the Court to Plaintiffs' production request and notice plan.  Plaintiffs "seek the production, within fourteen (14) days and in Excel format, of the names, last known addresses, and last known email addresses of all [members of the collective whom Defendants employed] any time within the three (3) years preceding the filing of the Complaint through the present date."  Doc. 88 at 11–12.  Plaintiffs ask the Court to authorize them to provide notice by physical mail, as well as through email notice "sent through a single mass email to all potential collective members with Defendants' counsel blind copied on the email."  *Id.* at 12.  Plaintiffs ask for a sixty-day notice period.

19

The only aspect of this proposed notice plan that AstraZeneca challenges—in a footnote—is the length of the notice period itself, citing a case from the Eastern District of New York where the court allowed a fifty-day notice period. *See Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 357 (E.D.N.Y. 2008) (granting fifty-day opt-in period in FLSA case). If AstraZeneca felt that reducing the notice period by ten days was important, it should have elaborated on its argument in the body of its already over-sized brief (instead of labeling it as a mere "open issue," Doc. 95 at 25 n.7) for why potential collective members should be afforded less time to receive notice of this litigation and determine whether they wish to join it. *See Greer v. Advanced Equities, Inc.*, 683 F. Supp. 2d 761, 766 (N.D. Ill. 2010) ("[A]rguments raised only in footnotes are forfeited.").

In the exercise of its "wide discretion" to manage collective actions, the Court grants Plaintiffs' production request and approves their proposed notice mechanism. *Alvarez*, 605 F.3d at 449.

## III.     Equitable Tolling

Third, Plaintiffs ask this Court to equitably toll the statute of limitations through the date of this decision. Until now, the Court had entered equitable tolling as of the date of Plaintiffs' complaint based on the consent of both parties. As is their right, AstraZeneca now opposes any further equitable tolling. Plaintiffs contend that the Court should regardless extend equitable tolling because AstraZeneca's opposition to this motion "is beyond the control of the plaintiffs and the putative collective members." Doc. 88 at 13. The Court denies Plaintiffs' request, but will toll the statute of limitations for the time that elapses between this decision and the Court's approval of the notice form.

"[A] litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016) (alteration omitted) (citation omitted) (internal quotation marks omitted). The question of whether courts should consider the delay between a plaintiff's request for conditional certification and the court's grant of conditional certification as an "extraordinary circumstance" is context dependent. As the *Hunter* court stated:

> Some courts consider a delay in issuing a ruling on a conditional certification motion "an extraordinary circumstance that should not cause the opt-ins to lose out on the potential benefits" of a collective action lawsuit. *See Bergman*, 949 F. Supp. 2d at 860–61. Other courts disagree, however, reasoning that the passage of several months from motion to determination is a predictable and common result of busy dockets. *See, e.g.*, *Sylvester v. Wintrust Fin. Corp.*, No. 12 C 01899, 2014 WL 10416989, at *2 (N.D. Ill. Sept. 26, 2014). Still other courts question the ability to assess the diligence of potential plaintiffs in advance of their opting into the case. *See Calloway v. AT & T Corp.*, 419 F. Supp. 3d 1031, 1037 (N.D. Ill. 2019) (denying plaintiffs' motion to equitably toll FLSA claims prior to conditional certification without prejudice to individual opt-in plaintiffs' subsequent renewal).

2022 WL 864533, at *12.

However, a closer reading of *Bergman*, which the *Hunter* court cites to support the notion that the intervening period between motion and ruling may constitute an extraordinary circumstance, shows that the events of this case do not warrant a similar finding. In *Bergman*, briefing on the plaintiff's motion to certify a conditional collective action closed on June 30, 2011. Though the *Bergman* court acknowledged that "[i]n the usual course, a ruling would have occurred shortly thereafter," nearly two years passed before the court issued its decision. 949 F. Supp. 2d at 860. The court held that its "long delay in issuing a ruling [was] an extraordinary

circumstance that should not cause the opt-ins to lose out on the potential benefits of this lawsuit." *Id.* Here, Plaintiffs filed their reply brief on March 22, 2024. *See* Doc. 102. As of today, not even two months have elapsed before this Court's ruling. This cannot constitute "an extraordinary circumstance" without the Court necessarily agreeing "that equitable tolling should be granted in every Section 216(b) case as a matter of course during the pendency of a conditional class certification request, thereby transforming this extraordinary remedy into a routine, automatic one." *Sylvester*, 2014 WL 10416989, at *2. Because the Court declines to find that the ordinary lapse of time between briefing and ruling constitutes an extraordinary circumstance, it denies Plaintiffs' motion to equitably toll the statute of limitations as of the date they filed their motion.

However, the Court will equitably toll the statute of limitations as of the date of this Opinion. This is because the Court is imposing a delay between its decision to authorize Plaintiffs' notice and the date that they can send the notice to potential collective members to allow the parties to reach a mutually agreeable notice form. To assess whether equitable tolling is appropriate in this situation, the Court examines:

> (1) whether the extraordinary circumstances were beyond the
> control of the plaintiff or the putative collective members;
> (2) whether refusal to toll the statute of limitations would result in
> hardship for the putative collective members; and (3) whether
> tolling prejudices the defendant.

*Hunter*, 2022 WL 864533, at *12 (citing *Lucas v. JJ's of Macomb, Inc.*, 321 F. Supp. 3d 882, 886–87 (C.D. Ill. 2018)). The first element, the Court's imposition of a delay, tilts slightly in favor of equitable tolling. The delay was partially but not entirely within Plaintiffs' (and AstraZeneca's) control—on the one hand, they have been diligently working to create a notice form that is acceptable to both sides; on the other hand, the Court could have accepted Plaintiffs'

notice form or ordered modifications without mandating that the parties take additional meet and confer measures.  The second element, hardship to putative collective members, tilts in favor of equitable tolling because a potential opt-in plaintiff's claims could expire between now and when the parties reach agreement on the notice form.  *See Yahraes v. Rest. Assocs. Events Corp.*, No. 10 C 935, 2011 WL 844963, at *2 (E.D.N.Y. Mar. 8, 2011) (granting equitable tolling of FLSA claims in part due to court-imposed stay).  With respect to the third element, AstraZeneca will not be unfairly prejudiced because Plaintiffs' complaint included collective allegations when they first filed it at the inception of this case.  *See Lucas*, 321 F. Supp. 3d at 888 ("Tolling will not unfairly prejudice Defendant[s] because Defendant[s were] able to know the potential scope of [their] liability when the [] Complaint was filed.").  With the first element at worst neutral and the second and third elements counseling in favor of equitable tolling, the Court grants limited equitable tolling of the statute of limitations as of the date of this Opinion.  *See id.*; *Hunter*, 2022 WL 864533, at *13 (granting plaintiffs modified relief based on overbroad request for equitable tolling).[3]

---

[3] The Court notes that although it is allowing Plaintiffs to collect information for and provide notice to all potential collective members who may have suffered injury as of December 30, 2018, at least some of those opt-in plaintiffs' claims will no longer be valid.  Despite this, in the exercise of its discretion, the Court will authorize notice to those potential collective members for the ease of case administration and allow AstraZeneca to challenge any individual opt-in plaintiffs whose claims it believes are time-barred. *See Alvarez*, 605 F.3d at 449 (giving courts "wide discretion" to manage collective actions).

**CONCLUSION**

For the foregoing reasons, the Court grants Plaintiffs' motion to conditionally certify a collective [88]. The Court will allow Plaintiffs to send notice to females employed by AstraZeneca in sales positions as of December 30, 2018. The Court orders the parties to submit a jointly agreeable notice and consent forms by May 28, 2024. If the parties cannot agree on notice and consent forms, then they must each submit proposed documents by May 28, 2024, from which the Court will select. The Court tolls the statute of limitations for the time between when it issues this Opinion and it approves the parties' notice and consent forms. The Court sets a status date for May 30, 2024 at 1:45 p.m.

Dated: May 14, 2024

SARA L. ELLIS
United States District Judge